# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-2894
No. 03-1795
No. 03-1929

_____

| | | |
|---|---|---|
| Coca-Cola Company; McDonald's Corporation; Pepsico, Inc.; The Washington Post Company; Washingtonpost.Newsweek Interactive Company, LLC, | * * * * * | |
| | * | Appeals from the United States |
| Plaintiffs-Appellees, | * | District Court for the |
| | * | District of Minnesota. |
| v. | * * | |
| William S. Purdy, Sr.; Please Don't Kill Your Baby; Does 1-10, | * * * | |
| Defendants-Appellants. | * | |

_____

Submitted: March 12, 2004
Filed: September 1, 2004

_____

Before MURPHY, SMITH, and COLLOTON, Circuit Judges.

_____

MURPHY, Circuit Judge.

This case was brought under the Anticybersquatting Consumer Protection Act by the Washington Post Company and its wholly owned subsidiary Washingtonpost.Newsweek Interactive Company, LLC (the Post entities), the Coca-Cola Company, McDonald's Corporation, and PepsiCo, Inc. to stop William

S. Purdy[1] from appropriating Internet domain names[2] that incorporate and are confusingly similar to their trademarks and servicemarks. The district court[3] granted preliminary injunctive relief enjoining defendants from registering or using certain domain names and ordering them transferred to their proper owners. Purdy was later found in contempt and fined for violating the injunctions. He appeals from the preliminary injunctions and the contempt orders.

I.

Both the common law and Congress have provided protection to the holders of recognized trademarks to prevent others from appropriating or copying them and taking advantage of the owner's good will for their own benefit. See 1 McCarthy on Trademarks and Unfair Competition § 2:31 (4th ed.) (citing Weinstock, Lubin & Co. v. Marks, 42 P. 142 (1895); Hugo Stein Cloak Co. v. S. B. Stein & Son, 16 N.E.2d 609 (Lucas County 1937)). Congress enacted the Lanham Act over fifty years ago to protect the value of trademarks by encouraging their registration, see 3 McCarthy § 19:2, and to provide a federal cause of action to prevent their misappropriation, see 15 U.S.C. § 1125. One legislative purpose of that act was to ensure that "where the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats." S. Rep. No. 1333, at *3 (1946).

---

[1]Plaintiffs also named as defendants unknown individuals allied with Purdy, Does 1-10, and an unincorporated organization founded by Purdy called "Please Don't Kill Your Baby."

[2]A domain name is the "address" at which a computer user accesses a website on the Internet. A glossary of Internet terminology is available at http://www.verisign.com/nds/naming/glossary/.

[3]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

The development of the Internet created new areas of concern, and in 1999 Congress passed the Anticybersquatting Consumer Protection Act (ACPA) in order to prevent misappropriation of trademarks by stopping conduct known as "cybersquatting." See ACPA, Pub. L. No. 106-113, 113 Stat. 1501 (1999) (codified at 15 U.S.C. § 1125(d)). In the ACPA Congress added section 43(d) to the Lanham Act and defined cybersquatting as registering or using with a bad faith intent to profit a domain name that is confusingly similar to a registered or unregistered mark or dilutive of a famous mark. See 15 U.S.C. § 1125(d). See also 4 McCarthy § 25:78. A number of cybersquatting problems prompted Congressional action. There was concern about individuals registering domain names that are similar to famous marks for the purpose of profiting by selling them to the legitimate owners of the marks. See Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 238 (4th Cir. 2002). Congress was also aware of individuals attaching obscene or pornographic material to an infringing domain name in order to tarnish the mark. S. Rep. No. 106-140, at *6 (Aug. 5, 1999). Others attempted to divert unsuspecting consumers to their sites in order to engage in unfair competition. Id. Conduct of this sort has been described as the "Internet version of a land grab." Interstellar Starship Servs., Ltd. v. Epix, Ltd., 304 F.3d 936, 946 (9th Cir. 2002).

The legislative history of the ACPA includes findings that cybersquatters were engaging in consumer fraud and creating public confusion as to the true source or sponsorship of goods and services in a way that would impair electronic commerce, deprive trademark owners of substantial revenues and consumer goodwill, and place overwhelming burdens on trademark owners in protecting their valuable intellectual property. S. Rep. No. 106-140, at *2 (findings). The Senate report included concerns about misleading users of the Internet: "[I]f someone is operating a web site under another brand owner's trademark, such as a site called "cocacola.com" or "levis.com," consumers bear a significant risk of being deceived and defrauded, or at a minimum, confused." Id. at *5.

Congress enacted the ACPA to provide legal clarity for trademark owners by prohibiting bad faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from their goodwill. Id. at *4. The ACPA was intended to balance the interests of trademark owners against the interests of those who would make fair uses of a mark online, such as for comment, criticism, parody, and news reporting. Id. at *8. Nevertheless, the use of a domain name "in connection with a site that makes a noncommercial or fair use of the mark does not necessarily mean that the domain name registrant lacked bad faith." Id. at *8-9. See also H.R. Rep. No. 106-412, at *11 (1999). To recognize such an exemption would "eviscerate the protections of the bill by suggesting a blueprint for cybersquatters who would simply create criticism sites in order to immunize themselves from liability despite their bad-faith intentions." S. Rep. No. 106-140, at *9. For these reasons Congress gave courts the charge to "weigh the facts of each case and make a determination based on those facts whether or not the defendant registered, trafficked in, or used the domain name with bad-faith intent to profit from the goodwill of the mark of another." Id. at *10.

II.

In early July 2002 Purdy began registering Internet domain names which incorporated distinctive, famous, and protected marks owned by the plaintiffs. The domain names he registered included drinkcoke.org, mycoca-cola.com, mymcdonalds.com, mypepsi.org, and my-washingtonpost.com. The latter name was almost exactly identical to one which the Washington Post had used to operate an interactive online news service (mywashingtonpost.com), the only distinguishing detail being Purdy's addition of a hyphen.

Purdy typically linked the domain names to the website abortionismurder.com which contains antiabortion commentary and graphic images of aborted and dismembered fetuses. It also contains multiple "What Can I Do?" links to a website where a visitor can purchase hats, shirts, neckties, and

license plates with antiabortion themes and make donations using a credit card or bank account number. The content available at abortionismurder.com contained no references to plaintiffs, their products, or their alleged positions on abortion.

For several days in early July 2002 Purdy linked the domain names my-washingtonpost.com and drinkcoke.org to a website displaying what appeared to be a front page originating from washingtonpost.com. The page with this format featured the headline "The Washington Post proclaims 'Abortion is Murder'" and contained graphic images of aborted fetuses next to Coca-Cola's trademark and the words "Things Don't Always Go Better With Coke. Abortion is Murder — '*The Real Thing.*'" ("It's the Real Thing" is a registered trademark of the Coca-Cola Company.) Sometime after this litigation began, Purdy also linked many of the domain names to his own websites which contained references to a claim that plaintiffs supported abortion, graphic photos of aborted fetuses, and links to abortionismurder.com.

Counsel for the Washington Post entities sent a cease and desist letter to Purdy on July 8, 2002, and it persuaded his Internet service provider (ISP) to stop hosting the website at my-washingtonpost.com. Counsel for McDonald's and Pepsi contacted Purdy and his domain name registrars with similar requests around this time. During a telephone conversation with counsel for the Post entities on July 8, Purdy acknowledged that he had published a counterfeit front page at my-washingtonpost.com and claimed that his actions were protected by the First Amendment. The record indicates that Purdy offered to comply with the request of the Post entities if they would publish something written by him on the Washington Post editorial page, but they declined.[4] A few days later Purdy reactivated my-washingtonpost.com with a new ISP and published another counterfeit washingtonpost.com front page with antiabortion headlines and graphic

---

[4]At oral argument Purdy's counsel characterized this offer as simply "a matter of free speech. . . . Newspapers always run op ed pieces by people, and one of our complaints is that we never get our side heard in the op ed piece."

content.  He also registered washingtonpost.cc and washingtonpost.ws, linked them to abortionismurder.com, and began using the email address dontkillyourbaby@washingtonpost.cc.

Although Purdy now claims that he targeted all of the plaintiffs because of stands they had taken in the abortion debate, it appears from the record that he initially used many of the marks only because they would attract unwitting Internet users to his antiabortion message.  He wrote to a journalist in a July 16, 2002 email message that the domain names drinkcoke.org, mycoca-cola.com, mymcdonalds.com, mypepsi.org, and pepsisays.com were "abortion neutral names being used but not because of any stand they have taken on abortion."  He reported that the domain names were then attached to the website abortionismurder.com.

Plaintiffs filed this action on July 18, 2002 and moved for an emergency temporary restraining order and preliminary injunction.  A hearing was held on the motion on July 22, at which Purdy appeared pro se and the plaintiffs were represented by counsel.  The district court issued an emergency temporary restraining order and preliminary injunction on July 23.  The order prohibited Purdy and those acting in concert with him from using nine specified domain names: drinkcoke.org, mycoca-cola.com, mymcdonalds.com, mypepsi.org, pepsisays.com, my-washingtonpost.com, washingtonpostsays.com, washingtonpost.cc, and washingtonpost.ws.  In addition, the court ordered Purdy not to use

> any domain name that both (1) incorporates, and is identical or confusingly similar to, Plaintiffs' distinctive, famous and protected marks Coca-Cola®, Coke®, McDonalds®, McDonalds.com®, Pepsi-Cola®, Pepsi®, The Washington Post®, and WashingtonPost.com®, and (2) does not alert the unwary Internet user to the protest or critical commentary nature of the attached website within the language of the domain name itself.

Purdy was also required to transfer ownership of the specified domain names to the appropriate plaintiffs within three days of the order.

After plaintiffs complained that Purdy was continuing to register infringing domain names, the district court amended its order on September 5, 2002 to enjoin him also from registering infringing names. Despite this amendment, Purdy wrote to counsel for the Post entities on September 18 that he was "continuing to register domain names at an exciting pace." Since the original preliminary injunction went into effect on July 23, Purdy has registered at least 60 additional domain names incorporating plaintiffs' marks, including lovemcdonalds.com, gopepsi.org, thepepsichallenge.org, thewashingtonpostinternet.com, yourwashingtonpost.com, and thewashingtonpostnews.com, and he has claimed to have registered as many as 200.

On September 26, 2002 Washingtonpost.Newsweek Interactive Company, LLC (WPNI), a subsidiary of the Washington Post companies, learned that Purdy had registered the domain name wpni.org. Purdy also attached this domain name to an antiabortion website. After he registered the domain name, he received a number of misaddressed email messages intended for WPNI employees at wpni.com, and he telephoned two WPNI employees and read to them contents of their private emails. In addition, he told the two employees that he had received other messages that contained "juicy" content and threatened to publish them on the Internet and make them available to the New York Times unless this lawsuit were dropped.

The Post entities sent Purdy another cease and desist letter and filed a motion for a second emergency temporary restraining order and preliminary injunction on October 1, 2002. Purdy told a journalist that he was unable to comply with the cease and desist demands by the Post entities because he had transferred wpni.org to a third party named Pablo Rubio Sanchez. See Declan McCullagh, Washington Post Battles Domain Claim, CNET News.com, Sept. 27,

-7-

2002, <u>available at</u> http://news.com.com/2100-1023-959992.html. He also said that he was "leaving town" on the day he expected to receive service of process. <u>Id.</u> The district court issued a second temporary restraining order and preliminary injunction on October 3, 2002, finding that wpni.org was nearly identical to the well known WPNI acronym, ordering Purdy to transfer it to the Post entities, and repeating that Purdy was enjoined from registering or using such domain names.

The plaintiffs also moved on October 1 for an order to show cause why Purdy should not be held in contempt for violating the earlier preliminary injunction. The district court appointed a public defender to represent Purdy for purposes of the contempt motion, and a hearing was held on it in January 2003. The court found that Purdy still had not brought himself into compliance with its injunction and issued an order on January 28, 2003 finding him in contempt. The court listed more than 60 domain names that it found he had registered and/or used in violation of its original injunction.[5] It again ordered Purdy immediately to cease using the listed domain names and to transfer the names to the rightful owners within three days. Purdy was also ordered to pay plaintiffs $500 per day from the date of the order until he complied and to pay their fees, costs, and expenses.

The next week a status conference was held to assess Purdy's compliance with the January 28 contempt order. At that time Purdy was still using many domain names that had been specifically found to violate the court's injunctions. Although the plaintiffs had succeeded in forcing the transfer of many domain names registered in the United States, some registered in France had apparently not been transferred and were still linked to content of his choice. Despite having been found in contempt on January 28 for registering ilovethewashingtonpost.com,

---

[5]Among the domain names listed in the district court's January 28 order were washingtonpoststates.com, washingtonposthealth.com, washingtonpost-editorialpage.com, yourwashingtonpost.com, gopepsi.org, pepsiheaven.com, pepsiright.com, thepepsichallenge.org, and lovemcdonalds.com. The court amended the contempt order on January 29 to correct minor clerical errors.

Purdy registered two new domain names on the day of the February 4 status conference: ilikethewashingtonpost.com and iadorethewashingtonpost.com. His only apparent attempt to bring himself into compliance was to send a copy of the district court's order to the French domain registrar by postal mail on Sunday, February 3, 2003, although the company's website indicated that it was to be contacted by email.

On March 10, 2003 the district court issued a supplemental contempt order. "After assuring the Court on February 4, 2003, that he was taking prompt steps to terminate the display of content via prohibited domain names, Defendant William S. Purdy, Sr. . . . continued to display content using many prohibited domain names, including washingtonposthealth.com, lovemcdonalds.com, and thewashingtonpostshareholder.com for more than a week thereafter." The court also found that Purdy had registered or used even more new domain names, including washingtonpost.nu, thewashingtonpostjesus.com, and others which it found violated its previous orders. Because Purdy had not purged his contempt since the February 4, 2003 status conference, the court ordered him to pay the plaintiffs $500 per day for 34 days for a total of $17,000.

III.

Now before the court are three consolidated appeals filed by Purdy. In 02-2894 he appeals from the district court's preliminary injunction (including its order for relief on July 23 as amended on September 5, 2002). In 03-1795 he seeks to appeal the district court's January 28, 2003 contempt order, and the March 10, 2003 supplemental contempt order and sanctions are the subject of his appeal in 03-1929.

Purdy argues that the district court abused its discretion in issuing the preliminary injunctive relief. He contends that the plaintiffs are unlikely to succeed on the merits of their ACPA claim because he did not have a bad faith

intent to profit from his registration and use of the domain names and because the First Amendment protects his conduct. He also contends that the plaintiffs would not be irreparably harmed in the absence of preliminary injunctive relief, that his interest in free expression outweighs their trademark rights, and that the public interest is not served by the preliminary injunction. He argues that the district court's injunction is vague and overbroad, and that the court exceeded its authority by holding him in contempt and ordering him to pay sanctions to the plaintiffs.

Plaintiffs respond that Purdy has acted with a bad faith intent to profit as defined by the ACPA, that the First Amendment does not protect the registration and use of domain names that are identical or confusingly similar to their marks, and that they are likely to succeed on the merits. They argue that the value of their marks would be irreparably harmed in the absence of a preliminary injunction, that Purdy retains ample channels for expression of his views without using confusing domain names, and that the public interest in preventing confusion among Internet users is served by the preliminary injunctive relief granted by the district court. They contend that its orders were carefully tailored to protect their trademark rights while preserving Purdy's right to express his views. As to the civil contempt orders and sanctions, they argue that appellate jurisdiction is presently lacking.

A.

In determining whether to grant a preliminary injunction a court considers (1) the probability of the movant's success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on other interested parties; and (4) whether the issuance of the preliminary injunction is in the public interest. See Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981) (en banc). A district court has broad discretion when ruling on preliminary injunction requests, and we will reverse only for clearly erroneous factual determinations, an error of law, or an

abuse of discretion.  United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1179 (8th Cir. 1998).

The district court found that plaintiffs had demonstrated a strong probability of success on the merits of their claim under the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d).  The ACPA provides in relevant part that

> A person shall be liable in a civil action by the owner of a mark . . . if, without regard to the goods or services of the parties, that person (i) has a bad faith intent to profit from that mark . . . and (ii) registers, traffics in, or uses a domain name that —
>> (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark; [or]
>> (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark . . .

15 U.S.C. § 1125(d)(1)(A).

The district court found that plaintiffs' marks were both distinctive and famous and that the domain names Purdy had registered and used were identical or confusingly similar to those marks.  It also found a strong likelihood that plaintiffs would prove that Purdy and others acting in concert with him had registered the domain names with a bad faith intent to profit by tarnishing and diluting plaintiffs' trademarks and by relying on their good names and goodwill to achieve the personal gain of promoting their messages, generating publicity, and raising money for supported causes.  There is no disagreement that plaintiffs' marks were distinctive and famous at the time Purdy began registering and using the domain names at issue.

At oral argument Purdy's new counsel raised the argument that his domain names are not confusingly similar to plaintiffs' marks because an Internet user

trying to visit one of plaintiffs' websites would not likely reach one of the domains created by Purdy.  He claims that an Internet user would most likely use a search engine to find the correct corporate website or would guess that the domain name would be the company's name followed by .com.  He points to no evidence in the record supporting this claim, and plaintiffs respond that the district court's finding that Purdy's domain names are identical or confusingly similar to their marks is amply supported by the record.

The question under the ACPA is not whether the domain names which Purdy registered are likely to be confused with a plaintiff's domain name, but whether they are identical or confusingly similar to a plaintiff's mark.  See 15 U.S.C. § 1125(d)(1)(A)(ii).  It is the challenged domain name and the plaintiff's mark which are to be compared.  See 4 McCarthy § 25:78.  The inquiry under the ACPA is thus narrower than the traditional multifactor likelihood of confusion test for trademark infringement.  Northern Lights Tech., Inc. v. Northern Lights Club, 236 F.3d 57, 66 (1st Cir. 2001) (quotations omitted).  The fact that confusion about a website's source or sponsorship could be resolved by visiting the website is not relevant to whether the domain name itself is identical or confusingly similar to a plaintiff's mark.  An example of this distinction is shown in People for Ethical Treatment of Animals v. Doughney [PETA], 263 F.3d 359 (4th Cir. 2001).  There, the Fourth Circuit found peta.org confusingly similar to PETA's mark even though the attached website was a clear parody of the organization, for "an internet user would not realize that they were not on an official PETA web site until after they had used PETA's Mark to access the web page 'www.peta.org.'"  Id. at 366-67.  See also Virtual Works, Inc. v. Volkswagen of Am., Inc., 238 F.3d 264, 266 (4th Cir. 2001) (vw.net similar to Volkswagen's "VW" mark even though attached website advertised ISP); Sporty's Farm L.L.C. v. Sportsman's Market, Inc., 202 F.3d 489, 497-98 (2d Cir. 2000) (sportys.com confusingly similar to aviation catalog company's "Sporty's" mark even though attached website advertised a Christmas tree farm).

-12-

A domain name typically consists of a top level domain extension, such as .com, .org, or .net, and a second level domain name, such as pepsi in pepsi.com. See Virtual Works, 238 F.3d at 266. Because all domain names end with a top level domain suffix like .com or .org, and domain registrars no longer enforce distinctions between the types of entities that may register names with these extensions, courts generally look to the second level domain name to determine whether it is identical or confusingly similar to a given mark. Id. at 271 (vw.net confusingly similar to "VW" mark); Sporty's Farm, 202 F.3d at 497-98 (sportys.com confusingly similar to "Sporty's" mark). See also S. Rep. No. 106-140, at *10 (ACPA's definition of "domain name" essentially reaches second level domain names).

Many of Purdy's domain names differ from plaintiffs' marks only by the addition of generic terms like "my," "says," or "drink" or by the addition of a top level domain suffix. Even if Internet users were seldom to come upon my-washingtonpost.com, mymcdonalds.com or drinkcoke.org, for example, we see no error in the district court's findings that the relevant second level domains (my-washingtonpost, mymcdonalds, and drinkcoke) are confusingly similar to the Washington Post, Coke, and McDonald's marks. See 4 McCarthy § 25:78 (fordtrucks.com would be confusingly similar to the "Ford" mark of Ford Motor Co.). The washingtonpost.cc, washingtonpost.ws, and wpni.org domain names differ from the Washington Post and WPNI marks only in that they include a top level domain suffix. They are thus confusingly similar, if not identical, to the Post entities' marks. See Sporty's Farm, 202 F.3d at 497-98 (second level domain name "sportys" in sportys.com indistinguishable from Sporty's mark). Moreover, the record indicates that Purdy intended to capitalize on the similarity between his domain names and plaintiffs' marks to attract unwitting Internet users to antiabortion websites, and intentional infringers are likely to succeed in creating confusion. See Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455, 466 (4th Cir. 1996); Wynn Oil Co. v. Am. Way Serv. Corp., 943 F.2d 595, 602 (6th Cir. 1991).

-13-

The record also contains evidence of actual confusion among Internet users. While trying to reach a website of the Coca-Cola Company, one Internet user visited Purdy's drinkcoke.org domain. At that time the domain was attached to the same counterfeit front page featured at my-washingtonpost.com, which included multiple images of aborted fetuses next to Coca-Cola's logo and slogans. Coca-Cola received an email from the visitor to that site on July 7, 2002. He reported that he had been "checking out your web pages and I came by [drinkcoke.org]." He complained that the website had Coca-Cola's logo "all over it" and the content had shocked him. "I am a Coke drinker myself, a fan i may say . . . I always have some in the fridge and I was drinking [one] right now! but I got to admit, I cant finish it after i seen this page" [sic]. Another example of actual confusion was demonstrated in connection with Purdy's use of the name wpni.org. Several Internet users sent email intended for employees of WPNI to Purdy's wpni.org, evidencing confusion from the similarity of the domain name to the WPNI mark. On the record before us, we see no error in the district court's finding that the domain names identified in its preliminary injunction were identical or confusingly similar to plaintiffs' marks.

Purdy contends that the district court erred in finding that plaintiffs were likely to establish that he had registered and used the domain names with a bad faith intent to profit. He argues that he used the domain names only to spread his message so he could not have had the requisite bad faith intent to profit. Plaintiffs argue that Purdy's conduct has met most of the statutory tests for bad faith intent, including those which include a profit element, and that the district court's finding is not erroneous. We review for clear error a district court's factual finding of bad faith intent to profit under the ACPA. See Northern Lights, 236 F.3d at 64. Cf. Black Hills Inst. of Geological Research v. Williams, 88 F.3d 614, 616 (8th Cir. 1996) (finding of bad faith is reviewed for clear error); Sweetarts v. Sunline, Inc., 380 F.2d 923, 928 (8th Cir. 1967) (finding as to bad faith in trademark infringement action is reviewed for clear error).

Our analysis begins with the statute itself, which provides nine nonexclusive factors for courts to consider in determining whether a person has acted with bad faith intent:

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section.

15 U.S.C. § 1125(d)(1)(B)(i). The first four factors have been seen as reasons why a defendant might in good faith have registered a domain name incorporating someone else's mark, and the other five are indicia of bad faith intent. See Lucas Nursery & Landscaping, Inc. v. Grosse, 359 F.3d 806, 809-10 (6th Cir. 2004).

The first four statutory factors do not appear to weigh against a finding that Purdy had a bad faith intent. He has no legal rights in any of the marks that his domain names incorporate. See 15 U.S.C. § 1125(d)(1)(B)(i)(I). He is not known by any of the names, and he has never previously used any of them in the offering of goods or services. See id. at (II)-(III). While the evidence suggests that Purdy has made some noncommercial or fair use of the plaintiffs' marks in critical commentary sites accessible under the domain names, prior to the filing of this lawsuit he principally attached the names to antiabortion websites that made no mention of plaintiffs whatsoever. See id. at (IV). These websites can not be considered to be completely noncommercial since they directly solicited monetary contributions and offered various antiabortion merchandise for sale. See id. Even after Purdy attached the domain names to his own critical commentary sites, he continued to provide links to sites that solicit funds for the antiabortion movement and sell merchandise. Such use of the domain names would apparently profit the organizations of Purdy's choice, and nothing in the ACPA suggests that Congress intended to allow cybersquatters to escape the reach of the act by channeling profits to third parties. These factors support the district court's finding that plaintiffs were likely to establish Purdy's bad faith intent to profit from the marks.

Many of the remaining statutory bad faith factors also weigh in favor of the district court's finding that plaintiffs would likely prove that Purdy acted with a bad faith intent to profit. The record contains evidence that Purdy registered multiple

domain names knowing that they were identical or confusingly similar to plaintiffs' indisputably famous and distinctive marks.  See 15 U.S.C. § 1125(d)(1)(B)(i) (VIII) & (IX).  It appears that he registered many of these domain names not because of stands the plaintiffs had taken on abortion, but rather to divert Internet users to websites that could tarnish and disparage their marks by creating initial confusion as to the sponsorship of the attached websites and implying that their owners have taken positions on a hotly contested issue. See id. at (V).

Furthermore, the record shows that just days after Purdy began registering and using the domain names at issue in this case, he apparently offered to stop using the Washington Post domain names in exchange for space on the editorial page in that newspaper.  A proposal to exchange domain names for valuable consideration is not insignificant in respect to the issue of bad faith intent to profit. See id. at (VI); Lucas Nursery, 359 F.3d at 810 (principal harm targeted by ACPA is practice of registering domain names and offering them to the legitimate owners of the marks in exchange for consideration).  Although nothing in the record places a monetary value on access to space in a leading national newspaper like the Washington Post, that value could be significant to an advocate.  Profit includes an attempt to procure an "advantageous gain or return."  See American Heritage College Dictionary 1092 (3d ed. 1993).  See also PETA, 263 F.3d at 368 (defendant's suggestion that mark owner "make him a [settlement] offer" satisfied the intent to profit requirement).  The statutory factors are nonexclusive, and other conduct of Purdy, such as trying to force a settlement of this action by threatening to publish private emails of WPNI employees received at wpni.org, is also suggestive of bad faith.

At this stage it appears that at least eight of the nine statutory factors weigh in favor of the district court's finding that plaintiffs would likely establish that Purdy acted with a bad faith intent to profit.[6]  This distinguishes his case from

---

[6]Plaintiffs have not argued on appeal that factor VII weighs against Purdy, and we see nothing in the record to establish that he provided misleading or false

Lucas Nursery, 359 F.3d 806, and TMI, Inc. v. Maxwell, 368 F.3d 433 (5th Cir. 2004), each of which involved a disgruntled customer of the plaintiff company who had purchased a domain name identical to that company's mark in order to establish a website critical of its business practices. Neither customer in those cases had registered multiple infringing domain names or offered to transfer the names in exchange for valuable consideration. Neither had linked the names to websites about issues other than the company's business or to websites that solicited donations or sold merchandise. Although the defendants in Lucas Nursery and TMI registered domain names that were identical or confusingly similar to the plaintiff marks, neither exhibited a bad faith intent to profit from their marks. In contrast, the district court did not err here in finding it likely that plaintiffs would prove that Purdy and his associates had registered and used domain names with a bad faith intent to profit from their marks in violation of the ACPA.

Purdy argues that the First Amendment entitles him to use the domain names at issue to attract Internet users to websites containing political expression and criticism of the plaintiffs. There is no dispute here about whether the First Amendment protects Purdy's right to use the Internet to protest abortion and criticize the plaintiffs or to use expressive domain names that are unlikely to cause confusion. Cf. Taubman Co. v. Webfeats, 319 F.3d 770, 778 (6th Cir. 2003) (taubmansucks.com permissible because it removes any confusion as to source); Name.Space, Inc. v. Network Solutions, Inc., 202 F.3d 573, 585-86 (2d Cir. 2000) (domain names which themselves express a message might be protected). The question raised in this case is whether the First Amendment protects a misleading use of plaintiffs' marks in domain names to attract an unwitting and possibly unwilling audience to Purdy's message. Use of a famous mark in this way could be seen as the information superhighway equivalent of posting a large sign bearing a

contact information when registering a domain name or that he failed to maintain accurate contact information.

-18-

McDonald's logo before a freeway exit for the purpose of diverting unwitting travelers to the site of an antiabortion rally.

The use of trademarks has not been protected where it is likely to create confusion as to the source or sponsorship of the speech or goods in question. In San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm., 483 U.S. 522, 541 (1987), for example, the Supreme Court held that organizers of the Gay Olympic Games had no First Amendment right to use and appropriate the value of the Olympics mark in spite of their having an expressive purpose. See also Anheuser-Busch, Inc. v. Balducci Publ'ns, 28 F.3d 769, 776 (8th Cir. 1994) ("A parody creating a likelihood of confusion may be subject to a trademark infringement action."); Mutual of Omaha Ins. Co. v. Novak, 836 F.2d 397, 402 (8th Cir. 1987) (upholding injunction against sale of antiwar merchandise bearing words and symbols likely to cause confusion with plaintiff's marks). The First Amendment has also been held not to protect the use of a trademark in a domain name that creates a likelihood of confusion as to the source or sponsorship of the attached website. See Planned Parenthood Fed'n of Am., Inc. v. Bucci, 1997 WL 133313, at *10-11 (S.D.N.Y. March 24, 1997) (First Amendment does not prevent injunctive relief against use of plannedparenthood.com, a nonexpressive source identifier), summarily aff'd, 152 F.3d 920 (2d Cir. 1998) (unpublished). Just because an opponent of the war in Iraq might assert an expressive purpose in creating a website with the name lockheedmartincorp.com, for example, the First Amendment would not grant him the right to use a domain name confusingly similar to Lockheed's mark. While Purdy has the right to express his message over the Internet, he has not shown that the First Amendment protects his appropriation of plaintiffs' marks in order to spread his protest message by confusing Internet users into thinking that they are entering one of the plaintiffs' websites. See 4 McCarthy § 25:76.

Purdy argues that his belief that his conduct was protected by the First Amendment brings him within the ACPA "safe harbor" provision. Under that

provision "[b]ad faith intent . . . shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii). As plaintiffs point out, the record here contains considerable evidence that Purdy lacked reasonable grounds to believe that his continued use of the domain names in question was lawful. He continued to register and use domain names in the face of repeated complaints and warnings from the plaintiffs that such conduct was unlawful and even after the district court issued preliminary injunctive relief. Moreover, Purdy had also been enjoined in a prior Internet case where he had used the domain name bnsf.org to criticize his former employer, the Burlington Northern Santa Fe Railroad, and to publish employee social security numbers and salary information mistakenly emailed to bnsf.org. That injunction was affirmed despite Purdy's claim that his actions were protected by the First Amendment, and that appellate decision was filed before Purdy engaged in the conduct at issue in this case. See Purdy v. Burlington N. Santa Fe Corp., 21 Fed.Appx. 518 (8th Cir. 2001) (per curiam) (unpublished).[7] Given the extensive evidence of bad faith in the record, we conclude that Purdy lacked reasonable grounds to believe that his conduct was lawful, and he is not entitled to benefit from the safe harbor provision. See PETA, 263 F.3d at 369 (citing Virtual Works, 238 F.3d at 270) (a defendant "who acts even partially in bad faith in registering a

---

[7]After the injunctions were issued in this case, Purdy registered and linked to antiabortion websites multiple names related to Faegre & Benson (local counsel to plaintiffs) and to the Minneapolis Star Tribune newspaper. These included faegre-benson.com, faegre-benson.org, faegre.biz, startribune-faegre-bensonlawfirm.com, startribune-faegre.com, faegrebensonlawfirm.com, startribunenewspaper.com startribunes.com, startribunesays.com, and startribuneknows.com. See Faegre & Benson LLP v. Purdy, 2004 WL 167570 (D. Minn. Jan. 5, 2004) (Davis, J.) (ordering transfer of the Faegre domain names); McClatchy Mgmt. Servs., Inc. v. Please DON'T Kill Your Baby a/k/a William & Mark Purdy II, William S. Purdy, FA0304000153541 (Nat. Arb. Forum May 28, 2003) (ordering transfer of Star Tribune domain names).

domain name is not, as a matter of law, entitled to benefit from [the ACPA's] safe harbor provision.")).

In sum, the record supports the district court's findings that Purdy registered and used domain names that are identical or confusingly similar to plaintiffs' marks with a bad faith intent to profit as defined by the ACPA. This conduct was not protected by the First Amendment, and Purdy is not entitled to the benefit of the safe harbor provision. The district court did not err in concluding that the plaintiffs have demonstrated a strong probability of success on the merits of their ACPA claim. See Dataphase, 640 F.2d at 114.

Purdy also contends that the district court erred in finding that the plaintiffs would be irreparably harmed by his conduct in the absence of a preliminary injunction. Id. The district court found that Purdy's domain names were likely to confuse the public as to the source and sponsorship of the attached websites and to divert Internet users from their intended online destinations. The record supports these findings. After this litigation began Purdy attached many of his domain names to websites which contain multiple references to plaintiffs' names and marks. As a result, an Internet search for a plaintiff's name would be likely to turn up one or more of Purdy's domains. An unwary Internet user might anticipate that the attached website would be sponsored by that plaintiff because of the similarity of the domain name to the plaintiff's mark. The record also contains evidence of actual confusion among Internet users. A showing that confusion is likely supports a strong presumption of irreparable harm. See Calvin Klein Cosmetics Corp. v. Lenox Laboratories, Inc., 815 F.2d 500, 505 (8th Cir. 1987). The district court did not clearly err in finding that plaintiffs would be irreparably harmed by Purdy's continued registration and use of the domain names to display pictures of dismembered aborted fetuses and by the links to fundraising appeals that did not originate from the plaintiffs. See Shields v. Zuccarini, 254 F.3d 476, 486 (3d Cir. 2001) (affirming finding of irreparable harm from confusingly similar domain names). Cf. Porous Media Corp. v. Pall Corp., 110 F.3d 1329, 1335 (8th Cir.

-21-

1997) ("An infringing mark, by its nature, detracts from the value of the mark with which it is confused.").

The district court also found that the potential harm to the plaintiffs in the absence of injunctive relief outweighed any harm to Purdy that might result from its grant. See Dataphase, 640 F.2d at 114. Purdy argues that the injunctions stripped him of First Amendment rights and that the balance of harms therefore tilts in his favor. As already discussed, Purdy has no First Amendment right to appropriate plaintiffs' marks in confusing domain names. Purdy retains multiple lawful avenues of expression, however, including publication of his ideas over the Internet using nonconfusing domain names. Failure to protect plaintiffs' trademark rights would "diminish [those] rights without significantly enhancing the asserted right of free speech." Novak, 836 F.2d at 402. See also Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Group, Inc., 886 F.2d 490, 493 (2d Cir. 1989) ("[T]rademark protection is not lost simply because the allegedly infringing use is in connection with a work of artistic expression."). The district court did not err in determining that the balance of harms tilts in favor of the plaintiffs.

Finally, the district court found that the injunction was in the public interest because Purdy's domain names were likely to confuse and divert Internet users from their intended online destinations and to damage plaintiffs' good names and goodwill. While the public interest is not ordinarily implicated by concerns related to business reputation, Medicine Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc., 336 F.3d 801, 805 (8th Cir. 2003), here Purdy registered multiple domain names that are identical or confusingly similar to marks belonging to the plaintiffs, at a time when consumers increasingly turn to the Internet for information about companies with which they do business. See S. Rep. No. 106-40, at *5. The danger of consumer deception warrants some regulation of trademark usage, see Cliffs Notes, 886 F.2d at 494, and the public interest in free expression is adequately protected by leaving open ample alternative avenues of communication. See Novak, 775 F.2d at 249. As a leading treatise on trademark law explains, "[t]he right to disseminate

-22-

criticism on the Internet cannot trump the public's right not to be deceived by a confusingly similar domain name." 4 McCarthy § 25:76. The district court did not err in finding that the public interest is served by the preliminary injunctions in this case.

We conclude that the district court did not abuse its discretion in issuing preliminary injunctive relief in this case. Plaintiffs have shown a strong likelihood of success on the merits of their ACPA claim. See Dataphase, 640 F.2d at 114. There is no error in the district court's determinations that plaintiffs would be irreparably harmed in the absence of a preliminary injunction, that this harm outweighs any potential harm to Purdy, and that the public interest supports an injunction. See id.

B.

Purdy raises several arguments about the scope and language of the first preliminary injunction as amended on September 5, 2002 and the second preliminary injunction issued on October 1, 2002 (dealing with wpni.org). He argues that the orders amount to an unconstitutional prior restraint on his speech and that they are vague and overbroad.[8] Although a court may exercise its discretion in fashioning injunctive relief, that discretion is not unlimited. See EEOC v. HBE Corp., 135 F.3d 543, 557 (8th Cir. 1998). Provisions of an injunction may be set aside if they are broader than necessary to remedy the underlying wrong. Id. An injunction must provide a person of ordinary intelligence a reasonable opportunity to understand what is prohibited. Schenck v.

_____

[8]Purdy also charges that the injunctions violate his rights under the Fifth Amendment, but he does not state any basis for the claim. It does not appear that he has property rights in the domain names since they are identical or confusingly similar to plaintiffs' protected marks, nor has he shown that he did not receive due process.

Pro-Choice Network of W. New York, 519 U.S. 357, 383 (1997) (citing Grayned v. City of Rockford, 408 U.S. 104, 110 (1972)).

Purdy's prior restraint argument warrants little discussion. As discussed above, the First Amendment does not protect the deceptive use of domain names that are identical or confusingly similar to another's trademarks, and Purdy's conduct was shown to have likely violated the ACPA. There are many examples where courts have enjoined the use of names that are confusingly similar to protected trademarks. See, e.g., Novak, 775 F.2d at 249 (enjoining sale of "Mutants of Omaha" antiwar merchandise that was likely to be confused with Mutual of Omaha insurance). Injunctions of unlawful conduct that is not constitutionally protected are not unconstitutional prior restraints. Cf. A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1028 (9th Cir. 2001) (First Amendment does not prevent injunction against unlawful use of copyrighted material); Dr. Seuss Enters., Inc. v. Penguin Books USA, Inc., 109 F.3d 1394, 1403 n.11 (9th Cir. 1997) (rejecting claim that injunction would constitute a prior restraint in violation of the First Amendment).

Purdy also complains that the court's requirement that his domain names put an unwary Internet user on notice of the "protest or critical commentary nature of the attached website" limits his universe of permissible domain names to those expressing a protest or critical message. He claims this is a content based restriction on his speech in violation of the First Amendment, but the injunctions do not restrict expressive content. Rather, they simply require that Purdy not use a domain name that is confusingly similar to plaintiffs' marks. Use of a trademark in a way that is likely to cause confusion as to the source or sponsorship of the expression is not protected conduct. See San Francisco Arts & Athletics, 483 U.S. at 541 (no First Amendment right to use Olympic marks to promote Gay Olympic Games); Balducci Publ'ns, 28 F.3d at 776 (no First Amendment right to use beer manufacturer's marks in parody that was likely to cause confusion); Novak, 836 F.2d at 402 (enjoining sale of "Mutants of Omaha" antiwar merchandise). Purdy

has not shown that the preliminary injunction in this case actually restricts his ability to express himself through domain names in nonconfusing ways.

The district court enjoined Purdy's registration and use of domain names that both (1) incorporate and are identical or confusingly similar to plaintiffs' marks, and (2) do not alert the unwary Internet user to the protest or critical commentary nature of the attached website within the language of the domain name itself. A domain name would violate the district court orders only if were confusing <u>and</u> if it failed to put Internet users on notice of the protest or critical commentary nature of the attached website. Thus, Purdy could register and use domain names incorporating plaintiffs' marks, such as PurdySupportsPepsi.com or PurdysCokeSite.com, to publish complimentary or critical commentary because neither name is identical or confusingly similar to any of plaintiffs' marks. <u>See Taubman</u>, 319 F.3d at 778 (6th Cir. 2003) (taubmansucks.com permissible because it removes any confusion as to source). Because the district court's orders restrict only Purdy's ability to attract visitors with domain names that infringe plaintiffs' rights in their marks, they do not impermissibly regulate the expressive content of his domain names or websites in a way that would violate the First Amendment.

Purdy also argues that the preliminary injunctions are impermissibly vague and overbroad. As noted above, the court preliminary enjoined Purdy's registration and use of any domain name that incorporates and is identical or confusingly similar to plaintiffs' marks and does not "alert the unwary Internet user to the protest or critical commentary nature of the attached website within the language of the domain name itself." He claims that the terms "unwary Internet user," "use," and "protest or critical nature" are so ambiguous as to make it impossible to know what conduct is permissible and what is impermissible.

When the injunctions are read as a whole, however, we believe that a person of ordinary intelligence could reasonably know what is prohibited, <u>Schenck</u>, 519 U.S. 357, 383 (1997), and there is nothing in the orders that a good faith reading

would not make clear.  See First Fed. Sav. & Loan Ass'n of Council Bluffs v. First Fed. Sav. & Loan of Lincoln, 929 F.2d 382, 385 (8th Cir. 1991).  Moreover, in light of Purdy's deliberate and continuing unlawful appropriation of plaintiffs' marks, it was not inappropriate for the district court to enjoin his further registration and use of domain names that the unwary Internet user would find identical or confusingly similar to those marks.  Cf. Tonka Corp. v. Tonk-A-Phone, Inc., 805 F.2d 793, 795 (8th Cir. 1986) (injunction that broadly enjoined use of Tonka name was necessary to prevent continued infringement of that mark).  We note that Purdy is free to request clarifications and adjustments to the scope of the district court's orders to address any genuine ambiguity or overbreadth that may come to light as this litigation proceeds.[9]  On the current record we conclude that the court's orders are neither impermissibly vague nor overbroad, and they do not infringe Purdy's constitutional rights.

C.

Purdy also attempts to appeal the district court's January 2003 contempt order and its March 2003 supplemental order and sanctions.  He argues that we have jurisdiction to consider these orders under 28 U.S.C. § 1291, but that statute provides appellate jurisdiction over "all final decisions of the district courts of the United States."  The imposition of sanctions for civil contempt during the course of a pending action is an appealable final order only if the person held in contempt is not a party to the pending action.  SEC v. Naftalin, 460 F.2d 471, 475 (8th Cir. 1972) (citing 9 Moore's Federal Practice, § 110.13(4)).  Because Purdy is a party to a still pending action, the district court's contempt order and sanctions are

---

[9]Purdy complains that the district court has denied his requests for clarification of its injunctions, but we note that it has repeatedly clarified the coverage of its orders through amendments, the contempt proceedings, and status conferences.  It has also given Purdy many months to bring himself into compliance.

-26-

nonappealable interlocutory orders.  See id.  See also Fox v. Capital Co., 299 U.S. 105, 107-09 (1936); In re Shalala, 996 F.2d 962, 964 (8th Cir. 1993); Omaha Indem. Co. v. Wining, 949 F.2d 235, 238 (8th Cir. 1991).  Purdy must await a final judgment to appeal the contempt order and sanctions.

## IV.

Accordingly, we affirm the orders of the district court granting preliminary injunctive relief, dismiss the appeals of the contempt order and sanctions for lack of jurisdiction, and remand for further proceedings.

_____