**REXEL, INC. and Rexel, S.A., Plaintiffs,**

v.

**REXEL INTERNATIONAL TRADING CORPORATION, Defendant.**

**No. CV 05–5936 FMC (MANx).**

United States District Court, C.D. California.

March 13, 2008.

---

Alexa L. Lewis, Jeffrey D. Goldman, Mitchell Silberberg and Knupp, Los Angeles, CA, Clint Pentecost, Baker Donelson Bearman Caldwell and Berkowitz, Jackson, MS, John R. Branson, Lea Hall Speed, Samuel F. Miller, Baker Donelson Bearman Caldwell and Berkowitz, Memphis, TN, for Plaintiffs.

Danielle M. Criona, Don H. Min, Mark B. Mizrahi, Robert Jacobs, Belasco Jacobs and Townsley, Hyong C. Kim, Wilson Quan, Yong Bom Lee, Law Office of Lee & Associates, Los Angeles, CA, for Defendant.

## ORDER RE: PARTIES' MOTIONS FOR SUMMARY ADJUDICATION/SUMMARY JUDGMENT

FLORENCE–MARIE COOPER, District Judge.

This matter is before the Court on Defendant's Motion for Summary Adjudication on the Issue of Likelihood of Confusion between Plaintiffs' Service Marks and Defendant's Design Trademark (docket no. 40), and Plaintiffs' Motion for Summary Judgment (docket no. 47), filed on February 20, 2007. The Court has considered the moving, opposition, and reply docu-

ments submitted in connection with the motions. The matter was heard on March 12, 2007, at which time the parties were in receipt of the Court's Tentative Decision For the reasons and in the manner set forth below, the Court hereby GRANTS Plaintiffs' Motion and DENIES Defendant's Motion.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs, Rexel, Inc. and Rexel, S.A. (collectively "Plaintiffs"), are engaged in the sale of electrical parts, supplies, and equipment and have done business in the United States using the "REXEL" name since 1995. (Pls.' Stmt. of Uncontroverted Facts ¶¶ 2–3.)[1] Plaintiffs purchase their products from third-party manufacturers for resale in their 328 retail stores, spread throughout 34 states, and/or via their websites, www.rexel.com and www.rexelusa. com. (*Id.* at ¶¶ 4–5, 12.)[2] Approximately 99% of Plaintiffs' products are third-party brands, while the remainder are "privately-labeled" (i.e., branded as "REXEL"), including fasteners, hand braces, cable ties, extension cords, electrical enclosures, data communications terminals, wire marking, fan braces, safety equipment, emergency lighting, ceiling fans, nuts, bolts, screws and pulling rope. (Pls.' Resp. to Separate Stmt. of Undisputed Material Facts ¶ 5; Decl. of Criona, Ex. 11 (Williams Dep. 134:14–20), Ex. 17; Decl. of Lewis, Ex. 2 at 67:1–5.)

On December 23, 1997, and January 6, 1998, Rexel, Inc. was granted federal trademark registrations (U.S. Reg. Nos. 2,124,121 and 2,127,573) for two "REXEL" marks, a "word" mark and a "design" mark. (Decl. of Lewis, Ex. 3, Decl. of Criona Exs. 2–3.) The registrations describe the marks as "service marks" to be used in connection with "wholesale distributorship services in the field of electrical supplies and lighting fixtures." (*Id.*)

Defendant, Rexel International Trading Corp. ("Defendant"), is a small wholesale distributor of consumer electronic goods such as stereos, DVD and CD players, headphones and telephones. (Pls.' Resp. to Separate Stmt. of Undisputed Material Facts ¶ 4; Decl. of Song ¶ 7.) In addition, since as early as August 2004, it has manufactured and sold general consumer dry cell batteries in standard sizes such as double A, triple A, C and D, using a stylized design with the "REXEL" name. (*Id.*) Defendant also uses its "REXEL" design on battery-related items, such as chargers and car emergency kits containing batteries and a flashlight for use by stranded drivers. (Pls.' Resp. to Separate Stmt. of Undisputed Material Facts ¶ 2.) Defendant's "REXEL" batteries and related goods are sold to the general consuming public in drug stores, grocery stores, toy stores, electronics stores and convenience stores, among other locations. (*Id.* ¶ 3.)

In or about 2003 or 2004, Defendant's founder, Mr. Jason Song, registered the domain names of rexelus.com and rexelusa.com, which Defendant uses to advertise its products. (Decl. of Lewis, Ex. 15 (Song Dep. 46:8–18).) Sometime thereafter, Defendant filed an application for federal registration (Serial No. 78410626) of its "REXEL" design mark for use in connection with batteries and other electronic

---

1. Rexel, Inc., is a wholly owned subsidiary of Rexel, S.A., a French corporation. (*Id.* ¶ 1.) Rexel, S.A. is "the world's largest electrical distributor with annual sales of 6.805 billion Euros and 1,700 offices in over thirty countries." (*Id.* at ¶ 48.)

2. Plaintiff's also sell "distressed" merchandise on e-Bay. (*Id.* at ¶ 13; Decl. of Criona, Exh. 11 (Williams Dep. 69: 13–16).)

goods. (Decl. of Lewis, Ex. 7.) However, registration was refused under Lanham Act § 2(d), 15 U.S.C. § 1052(d), on the basis of a finding by the Patent and Trademark Office ("PTO") examining attorney that the consuming public would likely be confused between Defendant's and Plaintiffs' marks because Plaintiffs use their marks "for wholesale distributorship services in the field of electrical supplies, and the applicant [Defendant] intends to uses its mark on dry cell batteries, battery chargers, consumer electronics consisting of audio and video products, converters, inverters and adapters." (Decl. of Lewis, Ex. 7 at 126.)[3] The examining attorney went on to note that "[s]ince the identification of the [Plaintiffs'] distributorship services in the field of electrical supplies is very broad, it is presumed that the registration encompasses all electrical supplies goods of the type described, including those in the applicant's more specific identification...." (*Id.*) A similar application for registration of Defendant's "REXEL" design mark for use in connection with dry cell batteries (Serial No. 78526869) was also rejected, for the same reason. (*Id.* at 148–164.)

On or about August 24, 2005, Defendant filed separate, "intent to use" applications in connection with the marks "LEXEL" and "LEXCELL," for use on consumer electronic goods including batteries, battery cables, battery cases, battery charge devices and battery chargers. (Decl. of Lewis, Exs. 4–5.) Around the same time, Defendant filed a similar "intent-to-use" application in connection with the mark "REXCELL." (Second Decl. of Song ¶ 3.)

In the interim, on March 10, 2005, Plaintiffs sent Defendant a "cease and desist" letter, in which they requested that Defendant immediately abandon its then-pending "REXEL" trademark applications and any use of the mark in connection with the sale of dry cell batteries, batteries and battery chargers, and any related goods. (Decl. of Lewis, Ex. 12.) When no response was received, Plaintiffs proceeded to file this action for (1) Infringement of Federally Registered Trademarks (15 U.S.C. § 1114); (2) Unfair Competition/False Designation of Origin (15 U.S.C. § 1125(a)); (3) Violation of the Federal Anticybersquatting Consumer Protection Act; (4) California Common Law Trademark Infringement; (5) California Common Law Unfair Competition; (6) California Trademark Dilution (Cal. Bus. & Prof. Code § 14430); (7) Violation of Cal Bus. & Prof.Code § 17200 *et seq.;* and (8) Declaratory Judgment of Exclusive Rights. Plaintiffs allege, *inter alia,* that Defendant's "REXEL" mark is confusingly similar to its own and that Defendant's use thereof on batteries and other related goods is an intentional attempt to mislead consumers into believing that Defendant's goods originate with Plaintiffs.

Defendants filed an Answer and Counterclaims for (1) Declaratory Relief; (2) Violation of the Sherman Antitrust Act; (3) Violation of Lanham Act Section 43(a); and (4) Unfair Competition, on September 16, 2005. A First Amended Complaint, encompassing the same eight causes of action as the original Complaint, was filed on October 6, 2005. Defendant's Answer (and Counterclaims) thereto was filed on

---

**3.** 15 U.S.C. § 1052(d) provides, in relevant part, that "[n]o trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it consists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office ... as to be likely, when used o n or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1052(d).

October 25, 2005, and the case proceeded to discovery.

On February 20, 2007, the parties filed the instant motions for summary adjudication/summary judgment. Plaintiffs move for summary judgment with respect to their first, second, fourth, fifth, seventh and eighth claims for relief. Defendant moves for "summary adjudication on the issue of likelihood of confusion between plaintiffs' service marks and defendant's design trademark," and, concomitantly, requests entry of summary judgment in its favor on all of Plaintiffs' causes of action but the sixth cause of action for dilution. (*See* Pls.' Mot at 2–3; Def.'s Mot. at 1, 25.)

The parties have submitted a multitude of declarations and other evidence in support of their respective motions. The parties have also raised various objections to that evidence, which the Court addresses throughout this Order where necessary and material to the Court's holding.[4]

## STANDARD OF LAW

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of " 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106

S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). Where the nonmoving party will have the burden of proof at trial, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. *See id.; see also Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1106 (9th Cir.2000) ("In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its burden of persuasion at trial."). If the moving party meets its initial burden, the nonmoving party must then set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The substantive law governing a claim determines whether a fact is material. *T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987); *see also Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir.2006) ("Material facts are those which may affect the outcome of the case.") (internal citations omitted). In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence and draws all reasonable inferences in the light most favorable to

---

4. Specifically, Defendant has filed a document entitled "Evidentiary Objections in Opposition to Plaintiffs' Motion for Summary Judgment," which is essentially a compendium of objections to broad categories of Plaintiffs' evidence and argument, rather than objections to "evidence" in the form specific declarations, etc. The Court has not considered those portions of t he document which

are vague and/or contain improper legal argument regarding the substantive merit of Plaintiffs' claims.

The Court has also not considered the Supplemental Declaration of Alexa Lewis and the Supplemental Declaration of Karl Williams, to which Defendant objects on the ground that they were produced and submitted for the first time with Plaintiffs' Reply Brief.

the nonmoving party. *T.W. Elec. Serv.*, 809 F.2d at 630–31; *see also Brookside Assocs. v. Rifkin*, 49 F.3d 490, 492–93 (9th Cir.1995). The evidence presented by the parties must be admissible. Fed.R.Civ.P. 56(e). Mere disagreement or the bald assertion that a genuine issue of material fact exists does not preclude the use of summary judgment. *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir.1989).

The standard that applies to a motion for summary adjudication is the same as that which applies to a motion for summary judgment. *See Gulf Ins. Co. v. Hi-Voltage Wire Works, Inc.*, 388 F.Supp.2d 1134, 1136 (E.D.Cal.2005) (citing *Mora v. Chem-Tronics, Inc.*, 16 F.Supp.2d 1192, 1200 (S.D.Cal.1998)).

## DISCUSSION

### I. Claims at Issue

 The parties agree that any dispositive findings by the Court on the issue of the "likelihood of consumer confusion" created by Defendant's continued use of the "REXEL" and/or other mark(s) will effectively resolve Plaintiffs' first, second, fourth, fifth, seventh and eighth causes of action for trademark infringement, unfair competition/false designation, common law trademark infringement, common law unfair competition, violation of Cal. Bus. & Prof.Code § 17200 and declaratory judgment. (*See* Def.'s Mot at 6 n. 3; Pls.' Opp'n at 1.)[5] However, Plaintiffs submit that their third claim for relief—for violation of the Federal Anticybersquatting Consumer Protection Act ("ACPA")—is not subject to the same "likelihood of consumer confusion" analysis and, therefore,

is not properly encompassed by Defendant's motion. Defendant does not respond to Plaintiffs' argument on this point in any of its papers. Moreover, the Court's independent legal research supports Plaintiffs' position that their ACPA claim requires proof of different and/or additional elements than an infringement claim. *See, e.g., Coca-Cola Co. v. Purdy*, 382 F.3d 774, 778 (8th Cir.2004) ("In the ACPA Congress added section 43(d) to the Lanham Act and defined cybersquatting as registering or using with a bad faith intent to profit a domain name that is confusingly similar to a registered or unregistered mark or dilutive of a famous mark.") (citing 15 U.S.C. § 1125(d)); *see also* 4 McCarthy on Trademarks and Unfair Competition § 25:78 (2006) (discussing elements of cybersquatting of trademark). Accordingly, the Court agrees that any determination as to a lack of likelihood of consumer confusion from Defendant's use of the "REXEL" mark will not affect the viability of the ACPA claim.

For these same reasons, the Court cannot enter summary judgment in favor of Plaintiffs on the ACPA claim at this time, as Plaintiffs suggest it should do in their Opposition to Defendant's motion. Plaintiffs' own motion for summary judgment is expressly limited to counts 1, 2, 4, 5, 7, and 8 of the First Amended Complaint and their evidence, as discussed herein, is directed exclusively to the issues of priority/incontestability of their marks and the likelihood of consumer confusion created by Defendant's ongoing use of the "REXEL". mark on various consumer goods. Accordingly, summary judgment may be

---

5. Relevant legal authority also supports the parties' positions. *See, e.g., Walter v. Mattel, Inc.*, 210 F.3d 1108, 1111 (9th Cir.2000) ("The test for false designation under the Lanham Act, as well as the common-law and statutory unfair competition claims, is wheth-er there was a likelihood of confusion.' "); *see also Thane Int'l v. Trek Bicycle Corp.*, 305 F.3d 894, 901 n. 3 (9th Cir.2002) ("Trek must prove a likelihood of confusion to succeed in its infringement claim under California law ....") (citation omitted).

granted at this time, if at all, only with respect to the first, second, fourth, fifth, seventh, and eighth causes of action.

## II. Marks at Issue

In their motion, Plaintiffs define the universe of Defendant's allegedly "Infringing Marks" to include "REXEL, REXCELL, BEXEZ, LEXEL and LEXCELL," (Pls.' Mot. at 2), while the First Amended Complaint seeks relief arising out of Defendant's use of the "REXEL, REXCELL, LEXEL, and LEXCELL" marks. In its Opposition, Defendant maintains that, because it has never used the marks "REXCELL, LEXCELL and LEXEL" in connection with any goods in commerce and has taken no affirmative steps to use them, aside from its filing of the "intent-to-use" applications with the PTO, these marks are not the proper subject of litigation.

Defendant is correct to point out that Plaintiffs have offered no evidence that Defendant has ever used the "REXCELL, LEXCELL or LEXEL" marks on its goods and/or in relation to any services rendered. In contrast, Defendant has offered affirmative evidence, in the form of the Second Declaration of Jason Song, which establishes that it has not. (*See* Second Decl. of Song ¶ 4) ("Defendant has never used any of these marks in interstate commerce nor has defendant take[n] any affirmative step, aside from filing the ITU applications, toward use of these marks.".) Mr. Song also declares that, while Defendant once bought and sold a small quantity of batteries branded with the name "BEXEL," Defendant is not related to the manufacturer of those batteries, has not sold them since December 2003, and has no intention of selling them again in the future. (*Id.* at ¶ 5.)

 Based on the evidence before it, the Court agrees that Defendant's activities with respect to the marks "REX-CELL, BEXEL, LEXCELL and LEXEL" fall short of constituting the "use in commerce" that is required for Plaintiffs to prevail on their infringement claims and/or establish the existence of an actual "case or controversy" under Article III. *See, e.g., Karl Storz Endoscopy–America, Inc. v. Surgical Techs., Inc.,* 285 F.3d 848, 853–854 (9th Cir.2002) ("In order to prevail on its Lanham Act claims, which are brought under section 32 (15 U.S.C. § 1114) and section 43(a) (15 U.S.C. § 1125(a)) of the Act, Storz must show that Surgi–Tech 'used' Storz's trademark 'in commerce' and that the use was likely to confuse customers as to the source of the product."); 15 U.S.C. § 1127 (defining "use in commerce" as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark"); *see also Virgin Enters., Ltd. v. Virgin Cuts, Inc.,* 149 F.Supp.2d 220, 228 (E.D.Va.2000) ("An actual case or controversy exists only where a party has engaged in a course of conduct demonstrating a 'definite intent and apparent ability to commence use* of the trademark.'") (citing *Starter Corp. v. Converse, Inc.,* 84 F.3d 592, 595–96 (2d. Cir.1996) citing *G. Heileman Brewing Co., Inc. v. Anheuser–Busch, Inc.,* 873 F.2d 985 (7th Cir.1989)). Accordingly, the Court's infringement analysis is properly confined to Defendant's use of the "REXEL" mark alone.

## III. Infringement Analysis

### A. Priority/Validity

 "Before infringement can be shown, the trademark holder must demonstrate that it owns a valid mark, and thus a protectable interest." *KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.,* 408 F.3d 596, 602 (9th Cir.2005) (citing *Tie Tech, Inc. v. Kinedyne Corp.,* 296 F.3d 778, 783 (9th Cir.2002)). Ownership is established through priority of use; it is

accorded to the first "bona fide" user of a mark. *See, e.g., Sengoku Works v. RMC Int'l,* 96 F.3d 1217, 1219 (9th Cir.1996) ("It is axiomatic in trademark law that the standard test of ownership is priority of use. To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services."). However, pursuant to 15 U.S.C. § 1065, "a federally registered trademark that is used continuously for five years becomes 'incontestable,' entitling the holder to an exclusive right to use the mark that can only be defeated on specifically enumerated grounds." *Watec Co. v. Liu,* 403 F.3d 645, 652 (9th Cir.2005) (citation omitted); *see also Reno Air Racing Ass'n v. McCord,* 452 F.3d 1126, 1134 (9th Cir.2006) ("The incontestability provisions of the Lanham Act were designed to provide a means for a trademark holder to quiet title in the ownership of his mark."); *M2 Software, Inc. v. Madacy Entm't,* 421 F.3d 1073, 1077 (9th Cir.2005) ("Once a mark is deemed 'incontestable,' the trademark-holder is entitled to an exclusive right to use the mark that can be defeated only on specifically enumerated grounds.") (citation omitted).

In the instant case, Defendant does not dispute that Plaintiffs' federally registered "REXEL" marks have acquired incontestable status under 15 U.S.C. § 1065 and/or that they otherwise have priority over Defendant's marks. (*See* Def.'s Opp'n at 6–7). Instead, Defendant insists that the rights afforded by Plaintiffs' registration

are somehow circumscribed due to the fact that Plaintiffs' marks are in the nature of *service* marks, rather than *trademarks.* (*See id.;* Def.'s Reply at 6–12.) [6]

■ To the extent that Defendant suggests that Plaintiffs have "lesser" rights in their marks due to their categorization as "service" marks, it is entirely incorrect. The Supreme Court has long held that the Lanham Act "generally applies the same principles concerning registration and protection to both trade and service marks." *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,* 469 U.S. 189, 191, n. 1, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985); *see also Nutri/System, Inc. v. Con–Stan Industries, Inc.,* 809 F.2d 601, 604 (9th Cir.1987) (noting that " 'identical standards' govern trademark and service mark infringement cases").

In addition, and also contrary to Defendant's intimation, Plaintiffs' infringement claims do not hinge on whether Plaintiffs can establish "priority" of use of their "REXEL" marks on goods *identical* to those purveyed by Defendant. Rather, the quintessential test, discussed *infra,* is whether Defendant's "junior" use of the mark on its batteries and/or other products is likely to cause confusion. *See, e.g., Brookfield Communs., Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1047 (9th Cir.1999) ("The first to use a mark is deemed the 'senior' user and has the right to enjoin 'junior' users from using confusingly similar marks in the same industry and market or within the senior user's natural zone of expansion."); *see also* 4 McCarthy § 24:7 ("The law protects trademark owners and consumers from likely

---

6. Under the Lanham Act, a service mark is defined as "any word, name, symbol, or device, or any combination thereof" used "to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services ..." 15 U.S.C. § 1127. In contrast, a trademark includes "any word, name, symbol or device, or any combination thereof" adopted and used by a manufacturer or merchant "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others ...." *Id.*

confusion that is caused by similar marks used on even non-competitive goods and services."). Indeed, as Plaintiffs point out, courts have frequently found that consumers may be confused by marks used in connection with goods by one party and services by another. *See, e.g., In re Hyper Shoppes (Ohio), Inc.,* 837 F.2d 463, 464 (Fed.Cir.1988) (upholding Trademark Trial and Appeal Board rejection of registration of "Biggs" mark in connection with "general merchandise services" due to likely confusion with previously registered "Biggs" mark for use on "wooden and upholstered furniture"); *Beef/Eater Restaurants, Inc. v. James Burrough, Ltd.,* 398 F.2d 637, 639 (former 5th Cir.1968) ("It is true that appellant operates a restaurant and appellees on the other hand make and vend gin. Both are consumable and it is repeatedly held that the parties need not be in competition and that the goods or services need not be identical.")

Defendant takes great pains to attempt to distinguish these and other cases cited by Plaintiffs on the grounds that the "senior" users in those cases were trademark holders, while the "junior" users were service providers. (*See* Def.'s Reply at 11–12). However, Defendant's analysis, which it continued to advance at oral argument, is simply a *non-sequitur.*[7] Moreover, Defendant does not offer any authority of its own to stand for the proposition that a senior user's service mark can never be infringed by a junior user's use of a similar mark on goods. Accordingly, the Court concludes that there is no genuine issue of material fact with respect to Plaintiffs' ownership of the "REXEL" marks and the validity thereof and, concomitantly, their ability to bring an infringement suit to protect their rights.[8]

## B. Likelihood of Confusion

Once ownership and validity are established, the likelihood of confusion— i.e., whether the similarity of the marks is likely to confuse customers about the source of the products or services—"is the central element of trademark infringement." *GoTo.Com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1205 (internal quotations omitted); *see also E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1290 (9th Cir.1992). In the Ninth Circuit, district courts are obliged to consider the following eight factors when evaluating likelihood of consumer confusion: (1) strength of the mark; (2) proximity or relatedness of the goods; (3) similarity of sight, sound and meaning; (4) evidence of actual confusion; (5) marketing channels; (6) type of goods and purchaser care; (7) intent; and (8) likelihood of expansion.

---

**7.** The Court can readily conceive of many situations in which the requisite "consumer confusion" would arise from a junior user's use of a senior user's *service* mark on *goods.* For example, a junior user's use of the mark "MARRIOTT" in connection with a line of toiletry items would likely result in consumers' belief that the products originated with the corporation hat owns the "MARRIOTT" chain of hotels and that provides the hospitality *services* related thereto.

**8.** In their Opposition and Reply briefs, Plaintiffs further assert that they have priority of rights at common law due to their use of the "REXEL" mark on various goods as early as 2002, but the proffered evidence, including Plaintiffs' Statement of Uncontroverted Facts, various discovery responses and the Declaration of Karl Williams and a "report" attached as an exhibit thereto (even when considered over Defendant's objection), clearly reflects that Plaintiffs did not sell privately-labeled "REXEL" products at a national level until *at least 2005.* However, Plaintiffs' prior use of their marks on specific goods is not necessary to confer seniority and ownership rights. Rather, those rights derive from Plaintiffs' incontestable registrations and prior, nationwide use of their mark in connection with their electrical supply distribution services.

*AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348 (9th Cir.1979); *see also GoTo. Com,* 202 F.3d at 1205 ("We have developed eight factors, the so-called Sleekcraft factors, to guide the determination of likelihood of confusion."). However, the *Sleekcraft* factors are not exhaustive and should not be applied rigidly or mechanistically. *See, e.g., Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.,* 109 F.3d 1394, 1404 (9th Cir.1997) ("These factors are to be considered in reaching a decision on the issue of likelihood of confusion. However, 'no mechanistic formula or list can set forth in advance' the variety of elements that comprise the market context from which likelihood of confusion must be determined.") (quoting Restatement (Third) of Unfair Competition § 21, comment a (1995)) (footnote omitted).

Precisely because the relative importance of individual *Sleekcraft* factors varies with the specific factual circumstances of a given case, the Ninth Circuit has repeatedly cautioned that "district courts should grant summary judgment motions regarding the likelihood of confusion sparingly...." *Thane,* 305 F.3d at 902 (citing *Clicks Billiards Inc. v. Sixshooters Inc.,* 251 F.3d 1252, 1265 (9th Cir.2001)); *see also Brother Records v. Jardine,* 318 F.3d 900, 903 (9th Cir.2003) ("Because of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena.") (internal quotations omitted). Nevertheless, summary judgment remains appropriate where the evidence is such that a rational trier of fact would have to conclude that confusion is "probable." *Cf. M2 Software,* 421 F.3d at 1085.

With these principles in mind, the Court turns its attention to the parties' evidence vis a vis each of the *Sleekcraft* factors, in turn.

### 1. Strength of the Mark

This factor strongly favors Plaintiffs. The initial strength of a mark is determined by its placement on the standard continuum of marks—generic, descriptive, suggestive, arbitrary or fanciful. *See, e.g., M2 Software,* 421 F.3d a 1080; *see also GoTo.com,* 202 F.3d at 1207 ("From weakest to strongest, marks are categorized as generic, descriptive, suggestive, and arbitrary or fanciful"). "Fanciful" marks consist of "coined phrases" that have no commonly known connection with the product at hand, while "arbitrary" marks are "common words" that also have no connection with the actual product. *See Surfvivor Media, Inc. v. Survivor Prods.,* 406 F.3d 625, 631 –632 (9th Cir.2005). A descriptive mark, in contrast, "defines a particular characteristic of a product in a way that does not require any exercise of the imagination". *Id.* at 632 (citations omitted). However, "[i]f a consumer must use imagination or any type of multistage reasoning to understand the mark's significance, then the mark does not describe the product's features, but suggests them. Such a mark is therefore classified as 'suggestive' rather than 'descriptive.' " *Kendall–Jackson Winery v. E. & J. Gallo Winery,* 150 F.3d 1042, 1047 n. 8 (9th Cir.1998). Finally, a mark is "generic" if it describes the product or service with which it is affiliated in its entirety. *Id.* ("*Generic marks* give the general name of the product; they embrace an entire class of products.") (citation omitted) (emphasis in original).

Here, Defendant insists that Plaintiffs' marks are merely descriptive, as they are indisputably derived from the Latin word "Rex," meaning "king," and the prefix "el," referring to "electrical" supplies. (*See* Pls.' Resp. to Separate Stmt. of Undisputed Material Facts ¶ 11.) Specifically, Defendant maintains that, because the meaning which can be ultimately extrapolated

from this combination is "King of Electrical Suppliers," the marks are "laudatory." *See, e.g., In re Nett Designs,* 236 F.3d 1339, 1341 (Fed.Cir.2001) ("Laudatory marks that describe the alleged merit of the goods are descriptive because they simply describe the characteristics or quality of the goods in a condensed form."); *see also Murphy v. Provident Mut. Life Ins. Co.,* 923 F.2d 923, 927 (2d Cir.1990) ("Marks that are laudatory and that describe the alleged qualities or characteristics of a product or service are descriptive marks.").

■ Plaintiffs counter by arguing that their "REXEL" marks are highly divergent from the types of marks typically regarded as laudatory, as the average consumer must make several, attenuated inferences prior to arriving at the true significance of the name. The Court agrees. As the leading treatise author in the field of trademark law suggests, "laudatory" marks involve a very direct, common language description of a product or service's purported quality. *See* 2 McCarthy § 11:17 (laudatory marks include "such terms as SPEEDY, FRIENDLY, DEPENDABLE, PREFERRED, DELUXE, GOLD MEDAL, BLUE RIBBON, SUPER BUY and the like."). Accordingly, Plaintiffs' marks are more properly classified as "arbitrary" or even "fanciful," as they are not comprised of readily recognizable, "common words."

In addition, even if Plaintiffs' marks were properly classified as "laudatory" and therefore merely "descriptive," their strength is nonetheless increased by Plaintiffs' significant commercial success. *See M2 Software,* 421 F.3d at 1081 ("A suggestive or descriptive mark, which is concep-

tually weak, can have its overall strength as a mark bolstered by its commercial success.") (internal citations omitted); *see also Entrepreneur Media v. Smith,* 279 F.3d 1135, 1144 (9th Cir.2002) ("We recognize, however, that although a suggestive or descriptive mark is inherently a weak mark, it may be strengthened by such factors as extensive advertising, length of exclusive use, public recognition . . . .") (internal quotations omitted). Plaintiffs have presented evidence regarding their extensive sales and retail presence in the United States, as well their large advertising expenditures. (*See* Decl. of Lewis, Ex. 1 (Williams Dep. 19–21, 93:12–94:9), Ex. 11.) [9] In addition, it is undisputed that Plaintiffs' have been using their marks in the United States (and abroad) since 1995.

■ Finally, contrary to Defendant's assertions, the strength of Plaintiffs' marks is not diminished due to their presence within a "crowded field." Defendants point to third-party uses of the name "REXEL" on various office supply products, such as shredders and staplers, as well as the existence of "Rexall" pharmacies. (*See* Def.'s Opp'n at 9–10; Decl. of Criona, Exs. 14–16.) However, none of these third-party goods and services are offered in the electrical supply field, which is the relevant field at issue here. *Cf. Miss World (UK), Ltd. v. Mrs. America Pageants, Inc.,* 856 F.2d 1445, 1449 (9th Cir.1988) ("[A] mark which is hemmed in on all sides by similar marks on *similar* goods cannot be very distinctive.") (internal quotations omitted) (emphasis added).

### 2. Proximity or Relatedness of Goods and Services

This factor also favors Plaintiffs. Plaintiffs distribute and sell numerous third-

---

**9.** To the extent that Defendant purports to object to Plaintiffs "evidence of general sales figures, sales and distribution methods, marketing, size and location," on relevance grounds (*see* Def.'s Evidentiary Objections in Opp'n to Pls.'s Mot at 6–7), the objection is overruled.

party brand electrical supplies, including batteries, and Defendants distribute and sell various electronic goods, including batteries and battery-related items. These items are undisputably "complementary" in nature. *M2 Software*, 421 F.3d at 1081–82 ("When dealing with the second *Sleekcraft* factor, the courts assess whether the goods are related or complementary. [Citation], Where the goods are related or complementary, the danger of confusion is heightened.") (citing *Sleekcraft*, 599 F.2d at 350). Accordingly, there is a real danger that the public will believe that Defendant's products originate with Plaintiffs.

In addition, Plaintiffs and Defendant's services and products are likely to be encountered within close proximity of one another. While it is true that Plaintiffs' stores do not carry Defendant's products, many of Plaintiffs retail stores are located in close proximity to stores that *would* carry Defendant's goods, such as Home Depot. (*See* Decl. of Lewis, Ex. 1 (Williams Dep. 70–72).) In addition, Plaintiffs' customers include smaller retailers, who may also be solicited by Defendant to purchase its "REXEL" batteries and/or other related goods. (Williams Dep. 90:15–91:3.) [10]

### 3. Similarity of the Marks

Similarity is determined by the appearance, sound and meaning of the marks when considered in their entirety and as they appear in the marketplace. *See GoTo.Com*, 202 F.3d at 1206; *see also Surfvivor*, 406 F.3d at 633 ("In considering the degree of similarity between the two marks, courts should analyze each mark within the context of other identifying features"). The similarities of the marks are weighed more heavily than differences. *See GoTo.Com*, 202 F.3d at 1206; *Brookfield*, 174 F.3d at 1054.

### a. Appearance

A determination that two marks are similar in "appearance" essentially amounts to a proverbial "I know it when I see it" revelation. *See* 3 McCarthy § 23:25 ("Similarity of appearance between marks is really nothing more than a subjective 'eyeball' test"); *GoTo.Com*, 202 F.3d at 1206 ("With a single glance at the two images, one is immediately struck by their similarity.").

In the instant case, the evidence reflects that the two marks are virtually identical in appearance. They are comprised of the same five letters, with the middle letter "X" set off in a different, more stylized cross-mark. (*See* Decl. of Goldman, Ex. 4; Decl. of Lewis, Exs. 3, 11.) Defendant insists that the crossmark it its design might be interpreted as a non-letter, allowing the mark to be read as "RE EL." (*See* Def.'s Mot. at 14; Def.'s Opp'n at 16.) However, Defendant presents no evidence to support its position other than a passing sentence in the report of its survey "expert," Dr. Michael Kamins. Without qualification or explanation, Dr. Kamins simply states "[i]n the real world, products are viewed in the context of their marks and trade-dress, and the stylized Rexel marks of both the plaintiff and defendant are significantly and visually different." (Decl. of Kamins, Ex. 1 at 4.) Indeed, Dr. Kamins' testimony is not even directed to the significance of the cross-mark "X," and he, too, refers to the marks collectively as "Rexel," not "REXEL" and "RE EL," throughout his report.

---

**10.** Once again, Defendant makes much of the fact that Plaintiffs do not use the "REXEL" marks on most of the goods they distribute and/or that the marks themselves are exclusively in the nature of "service" marks. However, because the goods and services at issue are clearly complementary, any lack of precise overlap is irrelevant.

Defendant's argument regarding the possibility that the consuming public might interpret its mark to be "RE EL" rather than "REXEL" is further undermined by the fact that the "REXEL" name appears in numerous places on Defendant's website in regular type with no stylization of the letter "x." (*See* Decl. of Lewis Ex. 10.) Defendant's website is at least one prominent way that consumers might encounter its mark "in the marketplace."

### b. Sound

Once again, Defendant maintains that its mark may be read (and therefore pronounced) as "REEL" or "RE EL," rather than "REXEL," given the stylization of the "x" as a "cross-mark being similar to daggers with sharp points." (Def.'s Mot. at 14). However, Defendant offers no evidence that consumers would prefer such an alternative pronunciation; instead, it simply points to the fact that Plaintiffs' expert, Dr. Rappenport, admitted that, in order to definitively determine how consumers would perceive the mark, he would have to conduct "some kind of a perception test." (Decl. of Criona, Ex. 9 (Rappeport Dep. 223:9–14).) Concomitantly, Defendant's founder, Jason Song, concedes that "REXEL" is the proper pronunciation of the company's name, as it is derived from the Latin word for "king" (Rex) and the Spanish language, masculine pronoun "el." (*See* Decl. of Song ¶¶ 20–21; Decl. of Lewis Ex. 15 (Song Dep. 243–44).) In addition, on pages of Defendant's website containing pictures of its batteries and chargers, the words "Xtreme Energy" frequently appear immediately below the word "REXEL." (Decl. of Lewis, Ex. 15 at 303, 309.) The "X" in "Xtreme" is written in the same stylized, cross-mark fashion. Accordingly, while recognizing that the there is no presumptively correct way to pronounce a trademark, the Court concludes that a reasonable member of the consuming public encountering Defendant's products in the marketplace would be strongly inclined to adopt the "REXEL" pronunciation. *See, e.g., Smithkline Beckman Corp. v. Proctor & Gamble Co.,* 591 F.Supp. 1229, 1239 (N.D.N.Y.1984) ("[T]here is no proper way to pronounce a trademark. . . . The inquiry is not what the correct pronunciation is, but what the usual pronunciation by the ordinary consumer is."); 3 McCarthy § 23:22 (noting general rule that "there is no 'correct pronunciation of a trademark' ").

### c. Meaning

The marks also have reasonably similar meanings in that both are derived in large part from the word "Rex," meaning "king" in Latin. If a given member of the consuming public is aware of the Latin derivation of the "Rex" prefix, he or she is likely to accord the marks highly similar meaning. If he or she is not so aware, he or she would probably accord no independent meaning to the entire word "REXEL" in connection with either parties' products.

### d. Overall Impression

When all three "similarity" subfactors—sight, sound and meaning—are considered together, the resulting balance is such that a reasonable trier of fact could not disagree that the marks are highly similar. Accordingly, this factor strongly favors Plaintiffs.

### 4. Evidence of Actual Confusion

█ " 'Evidence that use of the two marks has already led to confusion is persuasive proof that future confusion is likely.' " *M2 Software,* 421 F.3d at 1082 (quoting *Sleekcraft,* 599 F.2d at 352); *see also Surfvivor,* 406 F.3d at 633 ("Evidence of actual confusion by consumers is strong evidence of likelihood of confusion"). Evi-

dence may be presented in the form of direct evidence of actual instances of consumer confusion and/or "survey" evidence. *See* 3 McCarthy § 23.63 ("There are at least three evidentiary routes to prove a likelihood of confusion: 1. survey evidence; 2. evidence of actual confusion; and/or 3. argument based on an inference arising from a judicial comparison of the conflicting marks themselves and the context of their use in the marketplace."); *see also Playboy Enters. v. Netscape Communs. Corp.*, 354 F.3d 1020, 1026 (9th Cir.2004) ("Surveys are commonly introduced as probative evidence of actual confusion.").

Here, Plaintiffs' primary evidence of actual consumer confusion is a single phone call received by one of its store managers, Mr. Bill Gravel. Mr. Gravel testified at his deposition that he received a call from an individual who thought that Plaintiffs were distributors of "Rexel" batteries. (Decl. of Goldman, Ex. 3.) However, Mr. Gravel did not recognize him as a current customer. (*Id.*)

Plaintiffs also offer evidence that one Miguel Reyes, Division Operations Manager for Rexel, Inc., saw Defendant's batteries and thought they belonged to Plaintiffs. (Decl. of Goldman, Ex. 2 (Reyes Dep.).) Notwithstanding the fact that relevant portions of the deposition transcript are missing, Reyes' testimony is of little effect, given that he was not a consumer of Defendant's goods "in the, marketplace." Indeed, as Defendant points out, it is entirely unclear as to where and in what context Reyes even saw the batteries.[11]

Based on the foregoing, the Court agrees with Defendant that Plaintiffs' evidence of actual confusion is, at best, extremely minimal. *See, e.g., Surfvivor*, 406 F.3d at 633 (classifying actual confusion evidence as "scant" where a single retailer and customer mistook defendant's product as plaintiff's). Accordingly, this factor favors Defendant, albeit not strongly. As the courts in this Circuit have long recognized, "[b]ecause evidence of actual confusion can be difficult to obtain, its absence is 'generally unnoteworthy' and is given little probative weight." *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842 (9th Cir.2002) (citation omitted).

### 5. Marketing Channels and Potential Customers

The evidence reflects that Defendant's and Plaintiffs' customers and marketing channels are at least partially coextensive. It is undisputed that Plaintiffs market their services primarily to industrial and commercial electrical contractors and electricians, including through the direct mailing of advertisements to contractors within a five (5) mile radius of their stores, via in-store fliers and via industry-specific magazines and workshops. (Pls.'s Resp. to Separate Stmt. of Undisputed Material Facts ¶¶ 33–34.) However, while Plaintiffs' stores serve primarily contractors and other electrical specialists, they are open to the general public and are often located near stores that sell Defendant's batteries and other products. In addition, Plaintiffs' 30(b)(6) witness, Karl Williams, testified

---

**11.** Plaintiffs have also furnished the Court with a "survey" conducted by Dr. Michael Rappenport, regarding "Consumers' Perceptions of Rexel." However, Plaintiffs inform the Court, quite astonishingly, that they do not rely on Dr. Rappenport's opinion "in any of their arguments on the parties' Summary Judgment Motions." (*See* Pls.' Resp. To Def.'s Evidentiary Objections in Opp'n to Pls. Mot., at 6). Rather, they state that they "mentioned" his report and that of Defendant's rebuttal expert, Dr. Kamins, "only so that the Court would know that the parties expert [sic] testimony on this issue, which is at least in part contradictory." (*Id.*) Accordingly, the Court does not consider Dr. Rappenport's survey evidence at this time.

that, in recent years, Plaintiffs have sought to expand their customer base in the small contractor and individual consumer market. (*See* Decl of Lewis Ex. 1 (Williams Dep. 71–72).) They have built new stores (bearing their signage and marks) in locations close to stores that traditionally serve these markets, including Home Depot, and run yearly small battery promotions to attract electricians to their stores in a "non-professional" capacity. (*Id.*).[12]

More importantly, both Plaintiffs and Defendant market to third-party retailers and the public via the internet. (*See* Decl. of Song ¶ 10).[13] As discussed above, Plaintiffs and Defendant's "domain" names are extremely similar; thus, a customer searching for one company may inadvertently encounter the other. Finally, both Plaintiffs and Defendant market their products at trade shows, which would be likely to attract a similar customer base.[14]

Accordingly, this factor favors Plaintiffs.

### 6. Type of Goods and Purchaser Care

As alluded to above, "[l]ikelihood of confusion is determined on the basis of a 'reasonably prudent consumer.'" *Brookfield*, 174 F.3d at 1060. However, "[w]hat is expected of this reasonably prudent consumer depends on the circumstances." *Id.* When purchasing expensive items, the buyer is expected to be more discerning and less easily confused. *Id.; see also E. & J. Gallo*, 967 F.2d at 1293 (if goods or

services are expensive, it is assumed that buyers will exercise greater care in their purchases); *Sleekcraft*, 599 F.2d at 353. Conversely, when purchasing inexpensive items, customers often exercise less care, thereby making confusion more likely. *Brookfield*, 174 F.3d at 1060.

In the instant case, Plaintiffs note that Defendant's allegedly infringing products—batteries and other battery-related goods—are inexpensive, ephemeral items, subject to impulse buying. Accordingly, Plaintiffs argue, customers are not likely to be extremely careful or discerning when making their purchases, thus resulting in a greater likelihood of confusion regarding the true source of Defendant's product.

Defendant counters by arguing that, because Plaintiffs' typical patrons are sophisticated electrical contractors and electricians, they will inherently have a greater level of familiarity with Plaintiffs' "distributional approach" and, accordingly, "would have a healthy degree of doubt" as to whether Defendant's batteries and other products are actually associated with Plaintiffs.[15] However, at least some of Plaintiffs' potential customers are ordinary members of the public and/or electrical dilettantes, who may have heard of Plaintiffs due to their presence in a given locality, but would, at the same time, lack knowledge of the intricacies of Plaintiffs' business. In addition, even Plaintiffs' more sophisticated customers might not

---

**12.** Conversely, it would defy logic to conclude that electricians and electrical contractors never patronize the drug stores, grocery stores, toy stores, electronics stores and convenience stores where Defendant's batteries are sold (and advertised).

**13.** Although Mr. Song now insists that Defendant does not *sell* any products over the internet, it is undisputed that Defendant has and continues to use the internet as a marketing tool.

**14.** Plaintiffs insist that, at one trade show held in 2006, representatives of both companies were present. However, the evidence submitted (a single page of a deposition transcript), is insufficient to demonstrate this fact.

**15.** For this proposition, Defendant refers to the report of its rebuttal expert, Dr. Kamins, and several out-of-circuit cases that are factually dissimilar.

exercise the same degree of discernment when purchasing Defendant's batteries, given their inexpensive nature. Rather, they may affirmatively elect to purchase Defendant's products over other recognizable brands precisely because there is a chance they might originate with Plaintiffs and because the risk (of loss from purchasing an inferior product) is so low.

Accordingly, this factor favors Plaintiffs.

**7. Intent**

When an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public. *See Official Airline Guides v. Goss*, 6 F.3d, 1385, 1394 (9th Cir.1993); *see also Sleekcraft*, 599 F.2d at 354. Although intent to confuse consumers can constitute strong evidence of confusion, "the converse ... is not true: the lack of intent by a defendant is largely irrelevant in determining if consumers likely will be confused as to source." *Brookfield*, 174 F.3d at 1059 (quoting *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 287 (6th Cir.1997)); *GoTo.Com*, 202 F.3d at 1208 (concluding that even upon a finding of innocent intent, "it would prove nothing since no such intent is necessary to demonstrate a likelihood of confusion.").

In the instant case, Defendant's founder, Mr. Song, admits that he "knew" of Plaintiffs' marks no later than mid-2004, when he attempted to register a domain name involving the name "rexel," and encountered Plaintiffs' presence. (Decl. of Lewis, Ex. 15 (Song Dep. 42–43); Decl. of Song ¶ 23.) Mr. Song proceeded to "search" Plaintiffs' website to ascertain "what type of business they were in." (Decl. of Song ¶ 24.) Specifically, he searched to see if they sold batteries and, not finding any, concluded that they did not. (*Id.* at ¶ 25.) He then proceeded to register his own domain names, www.rexelus.com and www.rexel-usa.com, and apply for registration with the PTO for his highly similar "REXEL" design mark for use in connection with batteries and other consumer goods. (Decl. of Lewis, Ex. 15 (Song Dep. 46:5–13).)

While Defendant now insists upon Mr. Song's innocence, the facts generate a singular, contrary inference. Mr. Song clearly knew of the Plaintiffs' existence before it began to use its "REXEL" design on batteries and other electronic goods in or about *August 2004*. In spite of this knowledge, he did not seek the assistance of an outside attorney and/or conduct any additional "due diligence" to discover the precise nature of Plaintiffs' business. *Compare, e.g., M2 Software*, 421 F.3d at 1085 (no ill-intent where Defendant's attorney believed that Defendant could "carve out" a noninfringing mark).[16] In addition, given Defendant's status as a small, nascent company, it is reasonable to infer that Mr. Song hoped to capitalize, at least in part, on what appeared to be Plaintiffs' established goodwill and reputation in the field, even if his intent was not truly malicious. Accordingly, this factor also favors Plaintiffs. *See Brookfield*, 174 F.3d at 1059 ("This factor favors the plaintiff where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark.").

**8. Likelihood of Expansion**

To resolve this factor, the Court must determine "whether existence of the alleg-

---

**16.** Mr. Song claims to have consulted a corporate attorney when he first established the company, in or about *2001*. (Decl. of Song ¶ 19.) However, it appears that the attorney only conducted a search of California corporations and, thus, did not encounter Plaintiffs', which are incorporated in other states and/or abroad.

edly infringing mark is hindering [Plaintiffs'] expansion plans." *Surfvivor*, 406 F.3d at 634 (citing *Entrepreneur Media*, 279 F.3d at 1152); *see also E. & J. Gallo*, 967 F.2d at 1293 ("[A] strong possibility of expansion into competing markets weighs in favor of finding of infringement."). The evidence before the Court clearly reflects that, in the past several years, Plaintiffs have endeavored to expand their business to more generalized consumer markets and to include more "privately-labeled" (i.e., "REXEL" brand) products, although they have no immediate plans to sell REXEL batteries. (*See* Pls.' Resp. to Separate Stmt. of Undisputed Material Facts ¶ 51.)

Defendant protests that the Court cannot countenance Plaintiffs' expansion plans on two grounds (1) Plaintiffs did not state that they were or would be using the REXEL marks on goods in their Statements of Use to the PTO as part of their registration applications; and (2) Plaintiffs were not using the REXEL marks on products as of the time that Defendant entered the marketplace. As set forth above, the Court agrees that the evidence presented is insufficient to establish that Plaintiffs' widespread use of the "REXEL" name on privately-labeled products preceded Defendant's use of the mark on its batteries. In addition, although they dispute that the Statements of Use should have any relevance to their future expansion plans, Plaintiffs concede that "prior to 2005, it was relatively uncommon in the electrical supply industry that a distributor would sell their own branded products." (Pls.' Resp. to Separate Stmt. of Undisputed Material Facts ¶ 48.) Accordingly, Plaintiffs' likely expansion into the "private-label" market is not a reasonable consideration in the Court's confusion calculus.

Nevertheless, the Court finds that it remains appropriate to consider that Defendant's presence in the market is hindering Plaintiffs' ability to expand its business to other, third-party retailers and to non-professional customers. To the extent that retailers purchase overlapping products from Defendant, they will not purchase from Plaintiffs. Also, these retailers and/or the general public will likely be confused if they are solicited by representatives from both companies and/or receive advertising from both sources.

Accordingly, this factor still favors Plaintiffs, although less significantly than Plaintiffs would contend.

### 9. Combining the *Sleekcraft* Factors

■ Nearly all of the *Sleekcraft* factors favor Plaintiffs. Most significantly, Plaintiffs' mark is strong, the Defendant's mark is virtually identical, and the goods and services at issue are highly related and complementary. In addition, Defendant was aware of Plaintiffs' presence in the market before it embarked on its own "branding" of "REXEL" batteries, which it markets through similar channels and to retail outlets in competition with Plaintiffs. Finally, while Plaintiffs have failed to produce cognizable evidence of "actual" confusion, this failure is *de minimis* in light of the strength of the other factors and controlling Ninth Circuit case law. *See Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir.1991) ("[I]n this circuit, actual confusion is not necessary to a finding of likelihood of confusion under the Lanham Act."); *see also Brookfield*, 174 F.3d at 1050 ("The failure to *prove* instances of actual confusion is *not* dispositive against a trademark plaintiff, because actual confusion is hard to prove.") (emphasis in original). Accordingly, the Court concludes that a reasonable trier of fact would be compelled to find that consumer confusion between the marks is highly

probable, such that entry of summary judgment for Plaintiffs is appropriate at this time.

## CONCLUSION

Based on the foregoing, the Court GRANTS Plaintiffs' Motion for Summary Judgment (docket no. 47), and DENIES Defendant's Motion for Summary Adjudication on the Issue of Likelihood of Confusion between Plaintiffs' Service Marks and Defendant's Design Trademark (docket no. 40).

IT IS SO ORDERED.